ERLE P. HALLIBURTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

VIDA C. HALLIBURTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 36413, 36414. Promulgated March 30, 1932.

*Ben F. Saye, Esq.,* and *C. F. Miller, Esq.,* for the petitioners.
*Frank B. Schlosser, Esq.,* for the respondent.

1048

OPINION.

LANSDON: The respondent has determined the deficiencies here involved on the theory that the effective date of the organization of the corporation was July 23, 1924, and that the petitioners at no time thereafter owned as much as 80 per cent of the outstanding capital stock thereof. If the determination is sound, the petitioners, as equal owners of the partnership assets, realized profits by the sale thereof to the extent of the difference between the cost of such property adjusted as provided in section 202(b) and the value of the stock received therefor, which was $178,000. The petitioners contend that incorporation was completed at July 1, 1924, and that immediately thereafter they were the owners of more than 80 per cent of the outstanding capital stock and so remained until July 23, 1924, when the parties of the second part paid in $130,000 in cash and became stockholders to the extent of their obligations under the promotion agreement.

The record is clear that the corporation began business as of July 1, 1924. On that date the parties of the first part delivered

the assets of the partnership which, from that date, were used in the operation of the corporation. It is equally beyond dispute that all the acts incident to the transfer of title of such assets to the corporation were not done until July 23, when the signatures on the deed to the real estate and the assignments of the patents and patent licenses were attested.

The petitioners contend that the transaction falls within the exception included in (4) of section 203 (a) of the Revenue Act of 1924, which is as follows:

(a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized, except as hereinafter provided in this section.

\* \* \* \* \* \* \*

(4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons, this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

\* \* \* \* \* \* \*

(i) As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

In our opinion the record fails to support the contention of the petitioners. On June 19, 1924, the Halliburtons and the parties of the second part entered into an agreement to organize the corporation, which was set up as of July 1, 1924, at which date all the parties to such agreement became subscribers for the stock of the corporation and the capital structure thereof as authorized by the charter was complete to the extent of their obligations thereunder. It is true that the parties of the second part did not pay in their subscription for stock until July 23, 1924, but their liability had theretofore become fixed and was enforceable by the corporation and/or its creditors. It is also true that the parties of the first part did not do all the acts incident to the transfer of their assets until July 23. Upon the record it is perfectly clear that representatives of both parties participated in corporate activities from the date of incorporation and we think it may be fairly presumed that the parties of the second part signed the application for a charter, but that paper is not in evidence, possibly for that very reason. There is no merit in the contention that the petitioners were the sole stockholders immediately after incorporation, which we think was actually completed when all the terms of the promoter's agreement were accom-

plished and the parties of the first and second parts thereto became entitled to the benefits and charged with the obligations therein credited.

As an alternative issue the petitioners plead and argue that even if the exchange involved was a taxable transaction, the greater part of the profit derived therefrom resulted from the sale of capital assets held more than two years and should be taxed under the provisions of section 208 of the Revenue Act of 1924. In respect of this claim the respondent contends (1) that the provision for taxing capital gain does not apply to a sale of the operating assets of a going business, and (2) that, even if applicable, the evidence establishes no foundation for findings of fact upon which to base a redetermination of the asserted deficiency. In support of his first point he relies on *Henry L. Berg*, 6 B. T. A. 1287. The conclusions in that proceeding are not controlling here, since the issue there was governed by the Revenue Act of 1921, which provides at section 206 (a) (6) that, " The term ' capital assets ' as used in this section means property acquired and held by the taxpayer for profit or investment for more than two years (whether or not connected with his trade or business) but does not include property held for personal use or consumption, or stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year." In the Revenue Act of 1924, at section 208 (a) (8), which controls here, the definition of " capital assets " omits the words " acquired and held by the taxpayer for profit or investment." In our opinion the omission broadens the definition sufficiently to cover the facts herein and to render our conclusions in *Henry L. Berg, supra*, inapplicable here.

In relation to the second point argued by the respondent, the record discloses that the depreciated cost of all the listed assets transferred on July 1, 1924, was $62,709.64 at that date. It is stipulated that included therein was property, of the depreciated cost of $16,216.51, which had been owned by the partnership for more than two years. The petitioners contend that Letters Patent No. 1,369,891, with a stipulated depreciated cost of $12,216.51, was a part of such property and that if this amount is subtracted from the total depreciated cost of all the assets involved, the remainder must represent only the tangible properties which were specifically included in the transfer at cost. If this theory is sound, it follows that the purchase price of $178,000, less the depreciated cost of tangible property, $50,493.13, or $127,506.87, represents the sales price of the intangibles and includes all the profit derived from the transaction. If this is true and the depreciated cost of the intangibles is known, the resulting

profit is readily ascertainable and is taxable as capital gains if the property in question all consisted of capital assets which had been owned by the seller for more than two years.

The record discloses that the intangibles paid into the corporation consisted of Patents Nos. 1,369,781 and 1,486,883, a license to use Patent No. 1,101,484, owned by a competing concern, and the good will of the partnership. At July 1, 1924, the partnership had been so profitably engaged in the business of cementing oil wells for a number of years that the stock of the corporation formed to continue and expand its operations was readily salable at or above par. This indicates that the good will transferred to the corporation must have had a very substantial value. The petitioners have adduced no evidence to establish such value. The license to use Patent No. 1,101,484 and Patent No. 1,486,883 must also have had some value, since they are made the subject matter of several paragraphs of the promoter's agreement and are specifically assigned to the corporation. The petitioners argue, however, that on the record the entire value of the stock received for intangibles should be allocated to Patent No. 1,369,891, which appears to have covered the general process used by the partnership in cementing oil wells. An engineer of experience and standing testified that in his opinion such patent was worth at least $100,000 on July 1, 1924, and the oral evidence of Erle P. Halliburton is to the same effect.

Apparently the petitioners would have us find a value of $100,000 or more for Patent No. 1,369,891 and allocate the remaining receipts of stock for intangibles to other patents and the good will of the partnership. There is, however, no evidence that either of the patents or the license to use the third were ever owned by the partnership. The patents were issued to Halliburton and the license was in his name and there is no evidence of any assignment to the partnership. This may not be important in determining whether such intangibles were capital assets, but it is a fact that must be established before the separate tax liabilities of the two petitioners here can be redetermined.

Since the stipulation merely specified " patent " without any descriptive number, we can not determine that the agreed depreciated cost of $12,216.51 was that of Patent No. 1,369,891 alone, or that it included the other patent and the license to use a third. In our opinion the whole argument of the petitioners in support of their alternative contention is a fabric of mere presumptions of fact and law entirely to frail to support findings of fact adverse to the determination of the respondent.

*Decision will be entered for the respondent.*